**Reverse and Render; Opinion Filed March 3, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-01505-CV

**DALLAS NATIONAL INSURANCE COMPANY, Appellant**
**V.**
**CALITEX CORP.; ELSHIR ENTERPRISES, L.P.; AND THOMAS, L.P., Appellees**

**On Appeal from the 193rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-11-14157**

## OPINION

Before Justices Francis, Lang, and Lang-Miers
Opinion by Justice Lang

This is an insurance coverage case. Appellees Calitex Corporation; Elshir Enterprises, L.P.; and Thomas, L.P. (collectively, "Calitex") filed this lawsuit against appellant Dallas National Insurance Company ("DNIC") seeking, in part, a declaration that DNIC owes a duty to indemnify Calitex respecting a judgment Calitex obtained (the "underlying judgment") in a separate underlying lawsuit against a third party insured by DNIC (the "underlying lawsuit").

On cross-motions for summary judgment, the trial court granted both motions in part and denied both motions in part. Specifically, the trial court ordered that Calitex's motion for summary judgment "should be granted to award [Calitex] the amount of $500,000.00" as reflected in the underlying judgment; an additional $193,000 in attorney's fees awarded in the underlying judgment; and attorney's fees in this case in an amount to be determined by a jury. Following a jury trial respecting Calitex's attorney's fees incurred in this case, the trial court

signed a final judgment (the "final judgment") awarding Calitex "the principle amount of $693,000" and attorney's fees in this case in the amount of $135,250.

In five issues on appeal, DNIC contends (1) the trial court erred by "denying [DNIC's] special exceptions to [Calitix's] cross-motion for summary judgment and granting summary judgment in favor of [Calitex]"; (2) Calitex did not conclusively prove that all damages awarded against the insured in the underlying lawsuit are covered by the insurance policy in question; (3) genuine issues of material fact exist as to whether the damages awarded against the insured in the underlying lawsuit are "property damage" or whether such damages are excluded by the insurance policy in question; (4) the attorney's fees awarded to Calitex against the insured in the underlying lawsuit were not covered by the insurance policy in question; and (5) DNIC conclusively proved that the damages awarded in the underlying lawsuit were not covered by the insurance policy in question and therefore DNIC is entitled to a take-nothing judgment.

We decide in favor of DNIC on portions of its first, second, and fifth issues. We need not reach DNIC's remaining issues. We reverse the trial court's judgment and render a take-nothing judgment in favor of DNIC.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The insurance policy in question in this case (the "policy") is a commercial general liability insurance policy issued by DNIC to Turnkey Residential Group, Inc. ("Turnkey"). The initial policy period was August 2, 2006, to August 2, 2007, and the policy was renewed for an additional period of August 2, 2007, to August 2, 2008. The pertinent provisions of the initial policy and the renewal policy are identical.

In October 2006, Turnkey and Calitex entered into a written contract (the "contract") under which Turnkey, described in the contract as "the contractor," was to be paid by Calitex, described as "the owner," to construct a twelve-unit townhome complex in Dallas, Texas (the

"Project").  Pursuant to that contract, the Project was to be completed by Turnkey no later than October 26, 2007.  Construction of the townhomes began in November 2006.

On February 10, 2008, Calitex filed the underlying lawsuit against three defendants: (1) Turnkey; (2) Integrated Builders, Inc. ("Integrated"), described by Calitex as a subcontractor of Turnkey; and (3) David Hurst, an individual described by Calitex as Turnkey's "owner."  In its March 11, 2011 "second amended petition" in the underlying lawsuit, which was the live petition at the time of the judgment in that case, Calitex asserted it "began to encounter problems with Defendants' execution and performance in or around February of 2007."  According to Calitex, among those problems were (1) "the stone exterior . . . was not properly treated, leaked, or entire areas were left uncovered with stone (a problem that still exists)" and (2) "windows, once installed, leaked."  Further, Calitex asserted in its petition (1) "[a]s of February 10, 2008, over half of the Project units had not reached substantial completion and were not ready for use and/or occupancy" and (2) "[t]oday the Project is substantially complete," but "the quality of materials, labor and craftsmanship do not satisfy the standards required of Defendants under the [c]ontract" and have resulted in "damages."  Those damages were described as follows:

> The original value of the planned Project was Five Hundred Thousand Dollars ($500,000.00) per unit, resulting in a total Project value of Six Million Dollars ($6,000,000.00). Due to the poor quality of materials, craftsmanship, and construction, the Project units are only valued at Four Hundred Fifty Thousand Dollars (S450,000.00). The resulting damage for loss of valuation is Six Hundred Thousand Dollars ($600,000.00).

Calitex asserted causes of action for breach of contract, breach of warranty, and negligence. Additionally, Calitex requested attorney's fees pursuant to Texas Civil Practice and Remedies Code section 38.001.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (West 2015) (providing in part for recovery of attorney's fees pertaining to contract claims).

On February 14, 2008, Turnkey sent DNIC a notice of claim and a copy of Calitex's live petition at that time.  In a March 4, 2008 letter to Turnkey, DNIC stated it "has concluded that it

has no obligation to defend or indemnify Turnkey as a result of the factual allegations asserted against Turnkey . . . by Calitex." Following a jury trial, the jury found liability against Turnkey and Integrated.[1] The underlying judgment, dated March 15, 2011, awarded Calitex (1) $500,000 in damages and $193,500 in attorney's fees against Turnkey and (2) $500,000 in damages against Integrated.

Calitex filed this lawsuit against DNIC on November 7, 2011.[2] In its live petition at the time of the judgment complained of in this appeal, Calitex stated in part,

> The [Project] . . . was to be completed over an 11 month period with a commencement date of October 2006. . . . Due to unusually heavy rains in Dallas, Texas in the winter of 2006/2007, the [P]roject was delayed for approximately 3 months. After the building was put to its intended use, Calitex Corp. began noticing severe water infiltration in all of the condominium units. An investigation uncovered shoddy construction means and methods, including the failure to adequately waterproof the exterior sheathing of the building, improper installation of doors and windows, lack of adequate window/door flashings, improper sealing of exterior joints, [and] improper installation/application of exterior cladding–stone façade.

---

[1] The jury's answers in the charge of the court in the underlying lawsuit included, in part, the following:

Question No. 1
Did Defendant Turnkey Residential Group fail to comply with terms of its agreement with Plaintiff Calitex Corporation?
Answer "Yes" or "No': __Yes____
. . . .

Question No. 3
What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Plaintiff Calitex Corporation for its damages, if any, that resulted from such failure to comply that you found in response to Question No. 1?
Consider the following element of damages, if any, and none other:
The reasonable and necessary cost to remedy the defects, if any, with the construction project made the basis of this lawsuit.
Do not add any amount for interest on damages, if any. Answer in dollars and cents for damages, if any:
$___500,000___
. . . .

Question No. 9
Did Defendant Turnkey Residential Group fail to comply with the terms of its warranty to Plaintiff Calitex Corporation?
Answer "Yes" or "No": ___Yes___
. . . .

Question No. 11
What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Plaintiff Calitex Corporation for its damages, if any, that resulted from such failure to comply that you found in response to Question No. 9?
Consider the following element of damages, if any, and none other:
The difference, if any, between the value of the construction job as agreed to by the parties, and value of the construction job performed by Defendant Turnkey Residential Group. The difference in value, if any, shall be determined at the time and place the construction job was performed.
Do not add any amount for interest on damages, if any. Answer in dollars and cents for damages, if any:
$___500,000___

[2] This lawsuit was originally filed in the 162nd Judicial District Court of Dallas County. It was transferred to the 193rd Judicial District Court on March 22, 2013, upon motion by Calitex.

Calitex (1) asserted a claim for breach of contract as a third party beneficiary of the policy; (2) requested a declaratory judgment respecting Calitex's "rights, status, and other legal relations concerning coverage under [the policy]"; and (3) sought attorney's fees pursuant to Texas Civil Practice and Remedies Code sections 37.009 and 38.001. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (providing for recovery of attorney's fees in declaratory judgment actions); *id*. § 38.001.

DNIC filed a general denial answer. Additionally, DNIC asserted "affirmative defenses and denials" in which it stated in part it "affirmatively asserts that any damages sought or related to the underlying litigation are excluded from coverage to the extent there was 'property damage' to that particular part of real property on which the insured or any contractor or subcontractor working on the insured's behalf were performing operations, if the 'property damage' arose out of those operations."

On January 17, 2013, DNIC filed a "traditional and no-evidence motion for summary judgment." DNIC asserted in part (1) the damages and attorney's fees awarded to Calitex in the underlying lawsuit are not "covered damages" under the policy; (2) "the business risk exclusions of [the policy]" are applicable to at least some of the damages in question; and (3) Calitex "failed to meet their burden to allocate covered damages (if any) from non-covered damages." Specifically, as to the "business risk exclusions" of the policy, DNIC contended in part that exclusion j(5) of the policy excludes "'property damage' incurred while the insured is performing ongoing construction operations" and is applicable in this case. As to the "burden to allocate," DNIC asserted in part "the facts adjudicated and the trial record in the [underlying lawsuit] failed to allocate between covered and non-covered damages."

In support of its assertions, DNIC argued, in part, (1) at trial in the underlying lawsuit, "[Calitex] presented the testimony of Kenneth Lloyd, a waterproofing expert hired originally by

–5–

the Defendant, Turnkey, while construction of the townhomes was still underway"; (2) Lloyd "was retained to help diagnose and remedy water intrusion issues reported during construction of the Project," and "discovered that the stone facade on the townhomes' exterior was constructed with only one layer of waterproofing or damp proofing behind the stone, when two layers were required,"; (3) "[Calitex] also had Gordon Duncan, a registered civil engineer, testify about the estimated cost of repairing the stone veneer"; (4) "[b]ecause the building exterior had not been properly waterproofed, Duncan recommended removing and reapplying the entire stone façade"; (5) Duncan "testified that the damages calculated were for the repair and replacement of faulty stonework" and (6) during closing argument in the underlying lawsuit, Calitex's counsel "reiterated" that Calitex was seeking damages for replacement of "the defectively-installed stone."

The evidence attached to DNIC's motion included the following: (1) an affidavit of Jason Smith, a general liability claims manager for DNIC, in which Smith testified in part that on approximately February 14, 2008, DNIC received a notice of claim from Turnkey and "[b]ecause construction of the Project was still underway, several CGL exclusions known as 'business risk' exclusions, precluded coverage for the repair or replacement of defective workmanship and substandard goods and services while construction operations were still ongoing"; (2) copies of the policy[3]; the contract; the February 14, 2008 notice of claim received by DNIC from Turnkey;

---

[3] The policy states in relevant part as follows:

SECTION I—COVERAGES
. . . .
1. Insuring Agreement

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . . .

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;" and

      (2) The "bodily injury" or "property damage" occurs during the policy period.

and the March 4, 2008 letter from DNIC to Turnkey denying coverage; and (3) an affidavit of Jacqueline Montejano, counsel for DNIC. Attachments to Montejano's affidavit included (1) excerpts from the reporter's record of the trial in the underlying lawsuit containing the portions of the testimony of Lloyd[4] and Duncan[5] and Calitex's closing argument[6] described in DNIC's

---

. . . .
2. Exclusions
This insurance does not apply to:
. . . .
          j. Damage to Property
          "Property damage" to:
. . . .
                  (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations;.
. . . .
SECTION V—DEFINITIONS
. . . .
13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
. . . .
17. "Property damage" means

        a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

        b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

[4] The excerpts from the testimony of Lloyd attached to Montejano's affidavit included the following testimony:

Q. Can you tell us how you were involved in [the Project] sir?

A. I was employed by [Turnkey] to come in and help them solve problems after construction was 80 percent or 90 percent complete.
. . . .
Q. All right. The next sentence, "This, combined with the stone veneer walls, we believe has contributed to the majority of the reported leaks." Do you see that?

A. Yes.

Q. What was the issue that you observed concerning the construction of the stone veneer walls?

A. The stone veneer walls were very thin stone that was plastered onto the wall, and at some time during all my investigation, what I found was is [sic] that there was only one layer of waterproofing or damp proofing material behind the stone.

Q. Okay.

A. And it wasn't terminated correctly where it tied into the balconies.
. . . .
Q. You're familiar with the City of Dallas Building Codes as well, is that correct?

A. Yes.

Q. In fact, in your December 27th report you noted in Item Number 3 that the Building Codes require two layers of damp proofing behind stucco and stone veneer, and thus the addition of the felt; is that correct?

A. That's correct.

Q. And you obviously determined that it hadn't been done that way, therefore, you were recommending it, correct?

summary judgment motion and (2) copies of the charge of the court, the underlying judgment, and Calitex's March 11, 2011 second amended petition in the underlying lawsuit.

On February 15, 2013, Calitex filed a combined "response to [DNIC's] traditional and no-evidence motion for summary judgment" and "cross-motion for traditional and no-evidence summary judgment." Calitex contended in part,

> The property damages that Turnkey became legally obligated to pay as damages because of "property damage" to Plaintiffs is [sic] a covered occurrence. The jury [in the underlying lawsuit] determined that Plaintiffs suffered $500,000.00 in property damages as measured by the cost to remedy the construction defects to the Insured Property. Notably, the jury found that a cause of the property damage was the unintentional acts of Turnkey's subcontractor, [Integrated]. These uncontested facts entitle Plaintiffs to both traditional and no-evidence summary judgment in their favor.

Further, Calitex asserted (1) "[DNIC's] argument that the removal and replacement of the exterior cladding is not a 'covered property damage' ignores the [underlying judgment] as well

---

A. That's correct.

. . . .

And then the stone—I'm sorry, behind that is a steel lathe, that's what helps everything hold on to each other. Then they put on some more mortar, put on the stone and seal it.

What I saw—when the stone is actually put on, it's supposed to be put on a solid surface of mortar so it all attaches properly. What I saw, there was an insufficient amount of mortar applied to it in that one location.

[5] The excerpts from the testimony of Duncan attached to Montejano's affidavit included the following testimony:

Q. Now it's your opinion that we've got to remediate all the stone; is that correct?

A. Since we can't see behind it, that's the only way we can find out.

Q. Okay. And unlike the first observation where there were isolated events, you've now become aware of more events, enough that such you're now recommending all the stone be removed and replaced; is that correct?

A. Yes.

. . . .

Q. Okay. It looks like about $470,000 and change in estimated probable cost that a [sic] owner or investor or mortgagor of this property can likely anticipate incurring to bring this property to a proper standard; is that correct?

A. Yes.

[6] The excerpts from Calitex's closing argument attached to Montejano's affidavit included, in part, the following:

What sum of money, if paid now in cash, would fairly and reasonably compensate plaintiff Calitex Corporation for its damages, if any?

500,000. That's the number that you've heard in evidence that the replacement of the stone is going to cost to remedy the defects.

And let's be real clear as to what we're saying the defect is . . . . Even if the stone work had been done properly, it would have to come down, all of it, because the waterproofing was done bad.

. . . .

We believe the best measure of damages is what's it going to cost us to bring the building up to our expectations. $500,000. Let's get this stone off of here and waterproof this building so that we've got no leaks and we've got a good stone job, we're satisfied with that, even though we've suffered more damages than that.

as the actual evidence informing the jury's factual findings" and (2) "[n]one of the exclusions relied on by [DNIC] are applicable to bar coverage under the facts as pled and proved by Plaintiffs against Turnkey." Specifically, Calitex contended in part (1) "[t]he use of the present tense 'arises' in [exclusion j(5)] indicates that it is intended to exclude only that property damage which occurs while the insured is performing operations"; (2) exclusion j(5) is not applicable in this case because "[t]he property damage did not occur during ongoing operations," but rather "occurred after Turnkey ceased its operations at the jobsite and the condominiums were completed and put to their intended use"; and (3) "[t]here is no evidence in the summary judgment record that any of the damages that Plaintiffs recovered in the Underlying Lawsuit were discovered during 'ongoing operations' by Turnkey or its subcontractors."

Additionally, as to DNIC's contention that Calitex was required to "allocate" its damages between covered and non-covered damages, Calitex asserted in part, "[I]f Plaintiffs were seeking any non-covered damages, this would be true. However, both measures of damages awarded to the Plaintiffs are covered under the Policy."

Finally, Calitex asserted "assuming, arguendo, the [policy] does not require [DNIC] to pay Plaintiffs' attorney's fees for prosecuting the underlying suit," the Texas Civil Practice and Remedies Code "requires" DNIC to pay attorney's fees in this case if Calitex "prevails." The evidence attached to Calitex's summary judgment response/cross-motion consisted of copies of the notice of claim, a February 2008 "demand for coverage" letter to DNIC from Turnkey's counsel, documents pertaining to the bankruptcy of Hurst, the contract, portions of the policy, the charge of the court in the underlying lawsuit, and the underlying judgment.

Calitex amended its pleadings on February 18, 2013, adding several statutory claims not relevant to this appeal. On March 8, 2013, DNIC filed an amended traditional and no-evidence motion for summary judgment in which it restated its arguments described above and, in

addition, asserted it was entitled to summary judgment as to the statutory claims added by Calitex in its amended pleading. The evidence attached to DNIC's amended summary judgment motion was identical to that attached to DNIC's original summary judgment motion described above.

On March 29, 2013, DNIC filed a response to Calitex's cross-motion for summary judgment. In that response, DNIC (1) asserted in part that Calitex "seek[s] to convert commercial general liability insurance into a Builder's Risk policy and/or a Performance Bond to cover property damage that occurred while construction was underway and that was not completed to Calitex's satisfaction," which "has never been the purpose of CGL insurance," and (2) restated its arguments described above. Specifically, as to exclusion j(5) of the policy, DNIC contended in part that Calitex's argument in its summary judgment response/cross-motion described above "is factually inaccurate and more importantly, significantly misstates the law as to what triggers property damage under a CGL policy." According to DNIC, (1) exclusion j(5) applies to "'property damage' to real property . . . occurring while the insured is performing ongoing construction operations" and (2) "[p]roperty damage occurs when actual physical injury to tangible property happens, not when the damage is discovered or when its root cause is determined." Further, DNIC argued,

> [T]he facts proven in the Underlying Litigation demonstrate the stone façade leaked and caused damage almost immediately after it was installed. . . . Turnkey hired leak and waterproofing Kenneth Lloyd during construction of the Project specifically to help diagnose and remedy water intrusion issues related to the defectively installed stone. . . . Lloyd performed investigative waterproofing services from June through December 2007. In fact, Lloyd's work was performed entirely while construction was underway. To state the leak problems and issues with the stone delaminating were not discovered until *after* the project was completed demonstrates an alarming lack of candor.

(emphasis original) (citations omitted). The evidence attached to DNIC's summary judgment response included all of the evidence attached to its amended summary judgment motion

described above plus excerpts from the reporter's record in the underlying lawsuit containing portions of the trial testimony of Jonathan Shokrian, president of Calitex.[7]

Additionally, on the same date its summary judgment response was filed, DNIC filed "special exceptions and objections to [Calitex's] summary judgment evidence and motion to strike." DNIC asserted in part Calitex was not entitled to summary judgment because Calitex's cross-motion for summary judgment failed to (1) "identify the essential elements of the causes of action for which plaintiffs seek judgment"; (2) "attach summary judgment evidence referenced therein"; and (3) "attach attorney fee evidence." Further, DNIC contended the evidence relied upon by Calitex is "inadmissible hearsay and unauthenticated."

On that same date, Calitex filed a "supplemental response" to DNIC's traditional and no-evidence motion for summary judgment "to include additional evidence into the [trial court's] file that demonstrates the existence of genuine issues of material fact that preclude summary

---

[7] The portions of Shokrian's testimony attached to DNIC's summary judgment response included, in part, the following:

Q. . . .Turnkey had been paid 76 percent of General Conditions and its contractor fee and had claimed that the project was 76 percent completed, right?

A. Correct.

Q. And that was through the end of August; is that correct?

A. Correct.

Q. How many problems, since you were out on the site every day, how prominent were the issues with regard to leaks through August?

A. I would say probably about a third of the units were leaking at the time.
. . . .
Q. When, Mr. Shokrian, were you ultimately able to—to get in the building?

A. I was—I was the first person to move in and I think I moved in just right before my birthday, around January 15th of 2008.

Q. All right.

A. But shortly after I moved in I still had a lot of problems and so [TRG] had to send in a crew to work while I was living in the building, in the unit.
. . . .
Q. At what point did [Turnkey] stop showing up at the—at the site?

A. I would like to say it was probably around February or March.

Q. What was going on between the date that Pay Application 13 was submitted at the end of January through the time that Turnkey stopped showing up? What were they out there actually doing?

A. They were out there basically doing punch—punch work.

judgment in favor of [DNIC]." Attached to Calitex's supplemental response were 475 pages from the reporter's record in the underlying lawsuit containing (1) additional testimony of Lloyd, Duncan, and Shokrian and (2) testimony of Gary Lacey, a vice president of a Calitex affiliate.

DNIC filed an April 4, 2013 combined reply to Calitex's supplemental response and motion to strike Calitex's supplemental summary judgment evidence. DNIC asserted in part "[Calitex's] supplemental summary judgment evidence fails the 'fair notice' requirement to direct the court's attention to the evidence relied upon."

A hearing on the parties' cross-motions for summary judgment was held on April 5, 2013.[8] During May 2013, both parties filed post-hearing briefs. Calitex contended in part in its post-hearing brief (1) DNIC is "collaterally estopped" from "attacking" the underlying judgment and (2) the attorney's fees included in the underlying judgment are "recoverable" because they "resulted from damages because of property damage proximately caused by Turnkey and its subcontractor." DNIC responded in part (1) "the underlying judgment is not determinative of coverage and litigating coverage is not a 'collateral attack' on the underlying judgment" and (2) DNIC owes no duty to indemnify Calitex for attorney's fees awarded in the underlying judgment "because attorney's fees are not 'property damage' caused by an 'occurrence.'"

In two separate June 2013 orders, the trial court (1) granted portions of DNIC's traditional and no-evidence summary judgment pertaining to indemnity respecting damages awarded against Integrated in the underlying lawsuit and Calitex's statutory claims described above; (2) denied DNIC's special exceptions and objections to Calitex's summary judgment evidence and all other relief requested by DNIC; (3) granted, in part, Calitex's traditional and no-evidence motion for summary judgment as described above; and (4) denied all other relief

---

[8] The appellate record does not contain a reporter's record of the hearing on the parties' summary judgment motions.

–12–

requested by Calitex in its motion for summary judgment not expressly addressed by the trial court's orders.

DNIC filed a June 12, 2013 motion to reconsider the trial court's adverse summary judgment rulings, which motion was denied by the trial court. Following an August 2013 jury trial respecting Calitex's attorney's fees incurred in this case, the trial court signed the final judgment described above. This appeal timely followed.

## II. THE TRIAL COURT'S SUMMARY JUDGMENT

### A. Standard of Review

We review a trial court's summary judgment de novo. *See, e.g.*, *Holmes v. Graham Mortg. Corp.*, 449 S.W.3d 257, 260 (Tex. App.—Dallas 2014, no pet.) (citing *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010)). We apply well-known standards in our review of traditional and no-evidence summary judgment motions. *See Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). With respect to a traditional motion for summary judgment, the movant has the burden to demonstrate that no genuine issue of material fact exists and it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Nixon*, 690 S.W.2d at 548–49. We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. Tex. R. Civ. P. 166a(i); *Timpte Indus., Inc.*, 286 S.W.3d at 310. To defeat a no-evidence summary judgment, the nonmovant is required to produce evidence that raises a genuine issue of material fact on each challenged element of its claim. *Timpte Indus., Inc.*, 286 S.W.3d at 310; *see also* Tex. R. Civ. P. 166a(i). In both instances, we credit evidence favorable to the nonmovant if reasonable jurors could and disregard evidence contrary to the nonmovant unless reasonable jurors could not. *See, e.g., Holmes*, 449 S.W.3d at 260–61 (citing *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009)). When a party moves

for a traditional summary judgment under rule 166a(c) and a no-evidence summary judgment under rule 166a(i), we first review the trial court's judgment under the standards of rule 166a(i). *See, e.g., Mid-Continent Cas. Co. v. Castagna*, 410 S.W.3d 445, 449 (Tex. App.—Dallas 2013, pet. denied).

Although a denial of summary judgment is generally not reviewable, we may review such a denial when both parties moved for summary judgment and the trial court granted one motion and denied the other. *See, e.g., Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007). In our review of such cross-motions, we review the summary judgment evidence presented by both sides and determine all questions presented. *See id.*; *Castagna*, 410 S.W.3d at 449. If we conclude the trial court committed reversible error, we render the judgment the trial court should have rendered. *See Tex. Mun. Power Agency,* 253 S.W.3d at 192; *Castagna*, 410 S.W.3d at 449.

### *B. Applicable Law*

Under Texas law, an insurer may have two responsibilities relating to coverage: the duty to defend and the duty to indemnify. *Castagna*, 410 S.W.3d at 449. The insurer's duty to defend arises when a third party sues the insured on allegations that, if taken as true, potentially state a cause of action within the terms of the policy. *Id*. On the other hand, the insurer's duty to indemnify is triggered not by allegations in the pleadings, but by whether a plaintiff ultimately prevails on a claim covered by the policy. *Id*. at 450. "The duty to indemnify is 'determined based on the facts actually established in the underlying suit.'" *Id*. (quoting *Burlington N. & Santa Fe Ry. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*., 334 S.W.3d 217, 219 (Tex. 2011)); *see also D.R. Horton Tex., Ltd. v. Markel Int'l Ins. Co. Ltd.*, 300 S.W.3d 740, 744 (Tex. 2009) (insurer's duty to indemnify "depends on the facts proven and whether the damages caused by the actions or omissions proven are covered by the terms of the policy").

An insurer has no duty to indemnify its insured if the policy at issue does not provide coverage for the claims made against the insured. *Castagna*, 410 S.W.3d at 450. Under Texas law, the insured bears the burden of establishing the insurer's duty to indemnify by presenting sufficient facts to demonstrate coverage under the policy. *Id.* However, when the insurer relies on the policy's exclusions to preclude coverage, the insurer bears the burden of proving that one or more of those exclusions applies. *Id.* If the insurer shows that an exclusion applies, the burden shifts again and the insured must show that an exception to the exclusion brings the claim within coverage. *Id.* (citing *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010)).

Any limitations on liability in an insurance policy are strictly construed against the insurer and in favor of the insured. *Id.* at 463 (citing *Evanston Ins. Co. v. ATOFINA Petrochems., Inc.*, 256 S.W.3d 660, 668 & n.25 (Tex. 2008)). Further, the insurer must express any intent to exclude coverage in clear and unambiguous language. *Id.*

Insurance policies are controlled by rules of interpretation and construction applicable to contracts generally. *Id.* at 456. Terms in contracts, including insurance contracts, are given their plain, ordinary, and generally accepted meaning unless the instrument itself shows them to have been used in a technical or different sense. *Id.* If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. *Id.* The interpretation of an unambiguous contract is a question of law for the court. *Id.*

The term "business risk exclusions" is commonly used to describe certain exclusions included within the standard commercial general liability insurance policy for the purpose of excluding coverage for certain risks relating to the repair or replacement of the insured's faulty work or products or defects in the insured's work or product itself. *See Zurich Amer. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 500 (Tex. 2008). The rationale for treating such risks differently is

that "the insured can control the quality of the goods and services he supplies." *See, e.g.*, *T.C. Bateson Constr. Co. v. Lumbermens Mut. Cas. Co.*, 784 S.W.2d 692, 694 (Tex. App.—Houston [14th Dist.] 1989, writ denied).

Under the doctrine of concurrent causes, when covered and non-covered perils combine to create a loss, the insured is entitled to recover that portion of the damage caused solely by the covered peril. *See, e.g., All Saints Catholic Church v. United Nat'l Ins. Co.*, 257 S.W.3d 800, 802 (Tex. App.—Dallas 2008, no pet.); *see also Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 198 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (concluding doctrine of concurrent causation is applicable in third party insurance cases). The doctrine of concurrent causation is not an affirmative defense or an avoidance issue. *Comsys Info. Tech. Servs., Inc.*, 130 S.W.3d at 198. Rather, it is a rule embodying the basic principle that insureds are not entitled to recover under their insurance policies unless they prove their damage is covered by the policy. *Id.* Because an insured can recover only for covered events, the burden of segregating the damage attributable solely to the covered event is a coverage issue for which the insured carries the burden of proof. *Wallis v. United Servs. Auto. Ass'n,* 2 S.W.3d 300, 303 (Tex. App.—San Antonio 1999, pet. denied). "It is essential that the insured produce evidence which will afford a reasonable basis for estimating the amount of damage or the proportionate part of damage caused by a risk covered by the insurance policy." *Travelers Indem. Co. v. McKillip*, 469 S.W.2d 160, 163 (Tex. 1971); *see Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 840 (Tex. 1997) (reaffirming holding in *McKillip* ); *see also Wallis*, 2 S.W.3d at 304 ("reasonable basis" does not require "mathematical precision"). "[F]ailure to segregate covered and noncovered perils is fatal to recovery." *Comsys Info. Tech. Servs., Inc.*, 130 S.W.3d at 198.

### C. Application of Law to Facts

We begin by considering together portions of DNIC's first, second, and fifth issues. In those issues, DNIC contends in part (1) the trial court erred by "denying [DNIC's] special exceptions to [Calitix's] cross-motion for summary judgment and granting summary judgment in favor of [Calitex]"; (2) Calitex did not conclusively prove that all damages awarded against the insured in the underlying lawsuit are covered by the insurance policy in question; and (3) DNIC conclusively proved the damages awarded in the underlying lawsuit were not covered by the policy and was entitled to a take-nothing judgment in its favor.

In its argument on appeal, DNIC asserts in part "[e]ven if the defectively installed stone veneer and waterproofing are 'property damage,'" "the summary judgment record amply demonstrates that much of the damage to the building occurred during ongoing operations and, therefore, is excluded by [exclusion j(5)]." In support of that assertion, DNIC argues as follows:

> While Turnkey's construction operations at the project were still ongoing, Turnkey hired Ken Lloyd, a waterproofing expert, to investigate, determine the root cause and solve water leak problems. . . . Lloyd visited the project on several occasions to address water leaks which he believed were caused by non-conforming and defective construction workmanship that became apparent while Turnkey's construction operations were underway. Among faulty work Lloyd discovered, he determined that the exterior of the townhomes was being constructed with only one layer of waterproofing or damp proofing behind the stone, when two layers were required.
> Consistent with Lloyd's testimony and in stark contrast to Appellees' assertion that water damage was not discovered until Turnkey ceased performing operations, Jonathan Shokrian testified at trial that he was out on the site every day and that about a third of the units were leaking in August 2007 while Turnkey's construction was still ongoing.

(citations to record omitted). DNIC cites the portions of the reporter's record from the underlying litigation attached to its amended motion for traditional and no-evidence summary judgment and to its response to Calitex's cross-motion for summary judgment described above.

Calitex responds that DNIC has not conclusively established that any policy exclusion applies. Specifically, as to exclusion j(5), Calitex asserts on appeal,

There is no evidence in the summary judgment record that any of the damages that Appellees proved in the Construction Lawsuit occurred during "ongoing operations" by Turnkey or its subcontractors. Rather, the water damage was not discovered until Turnkey ceased performing active operations on the site and tendered the condominiums for occupancy to Appellees.

Appellees began discovering more serious property damage during the rainy months of January and February 2008. By then, it became clear that the building was leaking like a sieve and Turnkey was refusing to do anything satisfactory about it. Thus, suit was filed against Turnkey on February 13, 2008—during the Policy period—for negligence, gross negligence and breach of contract because of construction defects. After the initial lawsuit was filed, Plaintiffs continued discovering more water damage that occurred during the rainy months and amended their pleadings accordingly.

[DNIC's] summary judgment "evidence" that the property damage occurred during ongoing operations is neither relevant nor reliable and Appellees objected to the evidence in the lower court. Dallas National attached the affidavit of Jason Smith, a claims manager at Dallas National, to establish that property damages occurred prior to "substantial completion" on the project. Mr. Smith bases the averment not on any personal knowledge about the construction schedule, but rather his interpretation of Appellees' pleadings allegations. Furthermore, the affidavit is contravened by the testimony of Jonathan Shokrian—a witness with actual knowledge of the facts.

(citations to record omitted). In support of its argument, Calitex cites excerpts from the portion of Shokrian's testimony described above.

Even assuming without deciding that Calitex has properly objected to Smith's alleged lack of "personal knowledge" and Smith's affidavit should not be considered in this Court's analysis,[9] we cannot agree with Calitex that DNIC did not meet its burden to show the applicability of exclusion j(5). As described above, exclusion j(5) states the policy does not apply to "property damage" to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." "[U]se of the present tense 'are performing operations' in exclusion j(5) makes clear that the exclusion only applies to

---

[9] Additionally, Calitex asserts on appeal that it "objected" to DNIC's other summary judgment evidence in the trial court. However, the record (1) does not show a specific ruling on any objections by Calitex to DNIC's summary judgment evidence and (2) shows the trial court denied all relief requested by Calitex not expressly addressed by the trial court's orders described above. Calitex does not specifically assert any error on appeal respecting its objections to DNIC's summary judgment evidence.

–18–

property damage that occurred during the performance of construction operations." *Mid Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 213 (5th Cir. 2009); *accord Archon Inv., Inc. v. Great Amer. Lloyds Ins. Co.*, 174 S.W.3d 334, 339 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (pursuant to exclusion j(5) in CGL policy, damage to real property on which insured or its subcontractors "are performing operations at the time of the loss" is excluded from coverage). The testimony of Shokrian cited by Calitex in support of its argument respecting exclusion j(5) shows Shokrian stated he "still had a lot of problems" after he moved into one of the Project's buildings in January 2008. However, that evidence does not controvert or address the occurrence of property damage at some prior time while Turnkey or its subcontractors were performing operations. Further, to the extent Calitex's argument on appeal can be construed to assert exclusion j(5) is inapplicable because the damage in question was not "discovered" until after Turnkey was no longer performing operations, Calitex does not explain or describe how discovery of the damage in question is relevant to this Court's analysis. *See Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 24–25 (Tex. 2008) (property damage under commercial general liability policy occurred when actual physical damage to the property occurred, not when physical damage was or could have been discovered and not when property was exposed to a process, event, or substance that later resulted in physical injury to property, where policy defined property damage as "[p]hysical injury to tangible property," and explicitly stated coverage was available only if "property damage occurs during the policy period").

DNIC's summary judgment evidence included Lloyd's testimony in the underlying lawsuit that he was hired by Turnkey to help Turnkey resolve problems with the Project when construction was "80 percent or 90 percent complete." Those problems included leaks that Lloyd concluded resulted in part from inadequate waterproofing beneath the stone veneer of the exterior walls of the Project. Additionally, Lloyd testified there was "an insufficient amount of

mortar" applied to the stone in at least one location. Calitex does not specifically address Lloyd's testimony. Nor does Calitex address the portion of DNIC's summary judgment evidence that shows Shokrian testified that "about a third of the units were leaking" in "August" during construction of the Project. In the underlying lawsuit, Calitex presented the evidence described above and pleaded and argued that it was entitled to recover damages based upon defects pertaining to construction of the Project, including defective installation of the exterior stone and leaking.

On this record, we conclude the evidence shows that at least some of the damage proved by Calitex in the underlying lawsuit constituted damage to a "particular part of real property" on which Turnkey or its subcontractors were "performing operations" and arose out of those operations. *See Eulich v. Home Indem. Co*., 503 S.W.2d 846, 849 (Tex. Civ. App.—Dallas 1974, writ ref'd n.r.e.) ("arising out of the work" means resulting from performance of work by contractor); *cf. JHP Dev., Inc.*, 557 F.3d at 217 (concluding exterior finish constituted "that particular part" of property for purposes of exclusion in commercial general liability policy); *Malone v. Scottsdale Ins. Co*., 147 F.Supp.2d 623, 628 (S.D. Tex. 2001) (concluding alleged damage caused by builder's failure to use proper building materials or properly construct and install various components of structure "clearly 'arose out of' builder's operations" for purposes of j(5) exclusion). Therefore, we conclude DNIC met its burden to prove exclusion j(5) is applicable to some of the damage proved by Calitex in the underlying lawsuit. *See Castagna*, 410 S.W.3d at 450. Further, Calitex has not asserted or shown any applicable exception to exclusion j(5) respecting that damage. *See id*.

In light of our conclusions above, we next consider DNIC's assertion that "[b]ecause [Calitex] had the burden to segregate damages for any covered claims from non-covered claims, [DNIC] is entitled to summary judgment if **any** of the damages awarded against Turnkey in the

–20–

underlying lawsuit are excluded by any policy exclusion." (emphasis original). Calitex responds in part (1) "[a]lthough in certain circumstances an insured has an obligation to allocate covered and non-covered damages, the obligation does not exist when all of the damages included in a judgment are covered under the insurance policy" and (2) "[DNIC's] attempt to now go behind the [underlying judgment] to require [Calitex] to further account and allocate damages is tantamount to a collateral attack on the [underlying judgment]" and should be rejected.

In support of its argument, Calitex cites (1) *Employers Casualty Co. v. Block*, 744 S.W.2d 940, 943 (Tex. 1988), *disapproved of on other grounds by State Farm Fire & Casualty Co. v. Gandy*, 925 S.W.2d 696 (Tex. 1996), for the following quotation: "If an insurer breaches the duty to defend, it may not contest a determination that its insured was liable in the underlying settlement or verdict (or the amount of either)" and (2) *Evanston Insurance Co. v. ATOFINA Petrochemicals, Inc*., 256 S.W.3d 660, 672 (Tex. 2008), for the position that "if an insured's liability is established after a full adversarial trial on the merits and a judgment is rendered based on findings of fact or a jury verdict, the insurer is bound by the preclusive effect of the judgment and may not challenge the reasonableness of the damages in the coverage lawsuit." Additionally, Calitex contends this Court "has tacitly rejected an insurer's attempt to seek 'allocation' of damages as a way of avoiding its indemnity obligations when the insurer wrongfully refused to defend its insured." In support of that contention, Calitex cites *Great American Lloyds Insurance Co. v. Audubon Insurance Co*., 377 S.W.3d 802, 813 (Tex. App.—Dallas 2012), *opinion withdrawn by* No. 05-11-00021-CV, 2013 WL 85240 (Tex. App.—Dallas Jan. 8, 2013).

We do not find those authorities instructive. The quotation for which Calitex cites *Block* does not appear in that case, but rather is from a federal case that cites *Block* in support of the following statement:

> If an insurer breaches the duty to defend, it may not contest a determination that its insured was liable in the underlying settlement or verdict (or the amount of either). It remains free, however, to argue that the assumed liability was not in actuality covered under its policy, and thus no duty to indemnify arises.

*W. Alliance Ins. Co. v. N. Ins. Co. of N.Y.*, 176 F.3d 825, 830 (5th Cir. 1999). Also, both *Block* and *Evanston* contain additional statements not described by Calitex that distinguish a challenge to coverage from other challenges by insurers.

In *Block*, a homeowner entered into an agreed judgment with an insured contractor, then filed a lawsuit against the insurer to recover the damages under the agreed judgment. *Block*, 744 S.W.2d at 941–42. The supreme court addressed, in part, the issue of whether the insurer could contest coverage in the lawsuit brought against it by the homeowner. The court concluded "[s]ince the agreed judgment between [the homeowner] and [the insured] does not establish coverage, [the insurer] is free to contest coverage in the present suit since this does not constitute a collateral attack on the liability judgment." *Id.* at 943.

In *Evanston*, the supreme court concluded an insurer's denial of coverage barred it from challenging the "reasonableness" of the insured's settlement with a wrongful death plaintiff. *Evanston*, 256 S.W.3d at 674. However, in a footnote to that conclusion, the court stated "[t]he denial does not bar [the insurer] from challenging coverage." *Id.* n.74 (citing *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004) ("Even if a liability insurer breaches its duty to defend, the party seeking indemnity still bears the burden to prove coverage if the insurer contests it.")).

*Great American Lloyds*, unlike the case before us, involved a dispute between insurers as to the "reasonableness" of a settlement. *See Great American Lloyds*, 377 S.W.3d at 813–14. Moreover, the opinion cited by Calitex in *Great American Lloyds* has been withdrawn by this Court. *Cf. Cont'l Cas. Co. v. Street*, 364 S.W.2d 184, 188 (Tex. 1963) (stating that opinions withdrawn by appellate courts are no longer binding); *Frizzell v. Cook*, 790 S.W.2d 41, 43 (Tex.

–22–

App.—San Antonio 1990, writ denied) (stating that withdrawn opinions have no precedential value).

"A collateral attack is an attempt to avoid the effect of a judgment in a proceeding brought for some other purpose." *Block*, 744 S.W.2d at 943. Calitex does not describe, and the record does not show, how a coverage determination in this case would have any impact on the liability established in the underlying judgment. On this record, we cannot agree with Calitex that DNIC's challenge respecting coverage is "tantamount to a collateral attack" on the underlying judgment. *See id*.; *State Farm Lloyds v. C.M.W.*, 53 S.W.3d 877, 886 (Tex. App.— Dallas 2001, pet. denied) (where determination of coverage issue would in no way affect underlying liability judgment against insured, but rather would affect who is responsible for paying that judgment, insurer's challenge to coverage in declaratory judgment suit was not collateral attack on underlying liability judgment). We conclude Calitex had the burden to segregate covered damage from non-covered damage in order to recover in this case. *See Comsys Info. Tech. Servs., Inc*., 130 S.W.3d at 198.

Now, we address whether Calitex produced "evidence which will afford a reasonable basis for estimating the amount of damage or the proportionate part of damage caused by a risk covered by the insurance policy." *Travelers Indem. Co.*, 469 S.W.2d at 163; *Wallis*, 2 S.W.3d at 304. Calitex contends this burden was met by testimony attached to its "supplemental response" to DNIC's motion for summary judgment. Specifically, Calitex cites (1) testimony of Shokrian that Calitex has spent "upwards of over $200,000" on repairs that included "issues with stone falling" and numerous other problems unrelated to the stone; (2) testimony of Duncan that "stone replacement costs" were approximately $300,000; "window replacement and related costs (necessitated by defective installation that was causing interior water damage)" was approximately $103,000; and "the cost to replace felt, plywood sheathing, substructure damages,

–23–

etc." beneath the exterior stone "would be between $100,000 and $300,000"; and (3) testimony of Lacey respecting the types of repairs necessary based on his observations of the Project.

The portions of testimony cited by Calitex are among the portions objected to by DNIC in the trial court. The trial court denied DNIC's objections and DNIC challenges that ruling on appeal. However, we need not reach DNIC's appellate challenge to the denial of its objections. Even assuming without deciding that the portions of testimony in question were properly admitted into evidence, the record show (1) Shokrian's testimony that $200,000 had been spent on repairs did not apportion that amount in any way among the particular repairs he described; (2) the amounts described by Duncan pertained to repairs respecting stonework and leaking, but did not apportion any costs between covered damages and damages excluded pursuant to exclusion j(5) as described above; and (3) Lacey's testimony included no cost amounts. On this record, we conclude there is no "reasonable basis" in the record "for estimating the amount of damage or the proportionate part of damage caused by a risk covered by the insurance policy." *Travelers Indem. Co.*, 469 S.W.2d at 163; *see also Wallis*, 2 S.W.3d at 304.

As described above, failure to "segregate covered and noncovered perils" is "fatal to recovery." *See Comsys Information Tech. Servs., Inc*., 130 S.W.3d at 198; *Wallis*, 2 S.W.3d at 304. Accordingly, even assuming without deciding that the attorney's fees awarded in the underlying judgment were covered damages under the policy, we conclude (1) DNIC was entitled to summary judgment that it is not liable to Calitex for the $500,000 in damages and $193,500 in attorney's fees awarded to Calitex against Turnkey in the underlying judgment and (2) the trial court erred by denying DNIC's motion for summary judgment as to that relief.

Further, as to Calitex's cross-motion for summary judgment, DNIC argues in part on appeal (1) DNIC's "special exceptions" described above were improperly overruled by the trial court because Calitex's cross-motion failed to "state specific grounds," "specifically identify the

–24–

challenged elements," and "identify specific evidence supporting the motion" and (2) the evidence attached to Calitex's "supplemental response" in the trial court was filed "late" and without leave of court and therefore "this Court cannot properly consider such evidence." Even assuming without deciding that Calitex's cross-motion met all requirements as to specificity and that the evidence attached to its "supplemental response" was properly before the trial court, our conclusions above preclude summary judgment in favor of Calitex on the ground asserted by Calitex in its cross-motion, i.e. that it proved all the damage in question was covered under the policy. Therefore, on this record, we conclude the trial court erred by granting Calitex's cross-motion for summary judgment as to the amounts awarded to Calitex against Turnkey in the underlying judgment.

Finally, as described above, Calitex asserted in its cross-motion for summary judgment that if it "prevails" on the breach of contract or declaratory judgment claims asserted in this case, the Texas Civil Practice and Remedies Code "requires" DNIC to pay its attorney's fees. In light of our conclusions above, Calitex is not a prevailing party as to either claim in this case. The record shows no issue in Calitex's summary judgment cross-motion respecting its entitlement to recovery of attorney's fees as a non-prevailing party. On this record, we conclude Calitex was not entitled to the attorney's fees awarded in this case. *See Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex. 1993) (trial court's summary judgment ruling is restricted to issues raised in motion, response, and any subsequent replies); *see also Tex. Mun. Power Agency,* 253 S.W.3d at 192 (where trial court commits reversible error as to cross-motions for summary judgment, appellate court renders judgment trial court should have rendered).

We decide in favor of DNIC on portions of its first, second, and fifth issues.

### III. CONCLUSION

We decide in DNIC's favor on portions of its first, second, and fifth issues.  We need not reach DNIC's remaining issues.  *See* TEX. R. APP. P. 47.1.

We reverse the trial court's judgment and render a take-nothing judgment in favor of DNIC.


/ Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE


131505F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

DALLAS NATIONAL INSURANCE
COMPANY, Appellant

No. 05-13-01505-CV       V.

CALITEX CORP., ELSHIR
ENTERPRISES, L.P., AND THOMAS,
L.P., Appellees

On Appeal from the 193rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-11-14157.
Opinion delivered by Justice Lang, Justices
Francis and Lang-Miers participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that appellees Calitex Corp., Elshir Enterprises, L.P., and Thomas L.P. take nothing against appellant Dallas National Insurance Company.

It is **ORDERED** that appellant Dallas National Insurance Company recover its costs of this appeal from appellees Calitex Corp., Elshir Enterprises, L.P., and Thomas, L.P. The District Clerk of Dallas County is directed to release the full amount of the certificate of deposit in lieu of supersedeas bond to appellant Dallas National Insurance Company.

Judgment entered this 3rd day of March, 2015.